**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 05-1196 RB |
| | ) | |
| LEONARDO RODRIGUEZ-REYES, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** came before the Court on Defendants's (Leonardo Rodriguez-Reyes)
Motion to Suppress (Doc. 16), filed on August 10, 2005. The Government filed a response and, on
October 6, 2005, I heard testimony and argument on this motion. Being otherwise fully advised, I
deny this motion for the following reasons.

**I. Background**.

Rodriguez-Reyes moved to suppress evidence derived from his being detained by U.S. Border
Patrol on New Mexico State Road (hereinafter "NMSR") 11 north of Columbus, New Mexico.
Specifically, Rodriguez-Reyes argues that the stop violated the Fourth Amendment because the
officer lacked "reasonable suspicion" to stop the vehicle and, accordingly, all evidence derived from
the stop must be suppressed.

On February 24, 2005, U.S. Border Patrol Agent Jose Aguilar was on duty near New Mexico
NMSR 9 in Luna County, New Mexico. Shortly after 7:00 p.m., Aguilar became aware of a triggered
sensor roughly five miles west of Columbus, New Mexico. Aguilar drove west on NMSR 9 towards
the sensor.

Enroute, Aguilar saw a vehicle traveling eastbound on NMSR 9. Aguilar pulled off the road and positioned himself to be able to observe the eastbound vehicle as it passed.[1] Based on the time the sensor triggered and where he first saw the eastbound vehicle, Aguilar suspected that the on-coming vehicle might have caused the sensor's alert to sound.

As the vehicle passed his position, Aguilar observed that it was a silver Jeep Cherokee Sport Utility Vehicle (hereinafter "SUV") and that there was fresh mud on the bottom of the vehicle. In addition, the agent was aware that: (1) it had rained in the area earlier that day; (2) a number of roads leading from the Mexican boarder to NMSR 9 are unpaved, dirt roads; (3) drug and alien smugglers frequently use SUVs because many have "4-wheel drive" capabilities that are able to easily traverse undeveloped and unpaved roads; and (4) Border Patrol had experienced "increased activity consisting of intrusions of persons and vehicles illegally entering the United States from Mexico south of NSMR 9" in the days prior to the date in question. *See* Pl.'s Mot. in Resp. to Def.'s Mot. Suppress at 2.

Aguilar began to follow the Jeep. Driving behind the vehicle, the agent observed that it: (1) had so much mud on its fenders and bumper that mud was falling off the SUV and hitting the Border Patrol cruiser; (2) was traveling between 10 and 15 miles per hour below the posted speed limit; (3) was riding low; and (4) had Arizona license plates. Aguilar then ran a "lane check" on the vehicle and learned that it had not crossed through any port of entry within 72-hours and that the vehicle was registered to a female resident of Mesa, Arizona (a suburb of Phoenix, Arizona).

The vehicle turned north, away from the international border, at the intersection of NMSR 9 and NMSR 11. Traveling along NMSR 11, the vehicle traveled roughly 10 miles per hour below

---

[1]It is undisputed that this was the first eastbound vehicle Agent Aguilar encountered enroute to the location of the triggered sensor. *See* Def.'s Mot. to Suppress at 4.

the posted speed limit.  As the Border Patrol cruiser continued to follow the Jeep, it decreased its speed to 20 m.p.h. in a 35 m.p.h. zone.  Aguilar initiated an investigatory *Terry*[2] stop on NMSR 11 near Mile Marker 6.

Agent Aguilar approached the driver, Rodriguez-Reyes, and asked him his citizenship. Rodriguez-Reyes replied that he was a United States citizen.  The agent noticed several objects covered by burlap sacks in the rear seat of the Jeep.  Aguilar asked Rodriguez-Reyes if he had any passengers; Rodriguez-Reyes replied that he did.

After receiving consent from Rodriguez-Reyes to look inside the Jeep, Agent Aguilar opened the driver's side rear passenger door and directed his flashlight into the rear of the vehicle.  The agent then opened the burlap sacks and saw cellophane-wrapped packages that appeared to contain marijuana.  Thereafter, Aguilar placed Rodriguez-Reyes under arrest.

Aguilar requested assistance.  When Agent Jesus Flores arrived, Agent Aguilar handcuffed Rodriguez-Reyes and advised him of his *Miranda*[3] rights.  Rodriguez-Reyes waived his rights. Speaking with the two agents at the scene, Rodriguez-Reyes stated that he was transporting the marijuana to Deming, New Mexico in return for $3,000.  *See* Pl.'s Mot. in Resp. to Def.'s Mot. Suppress at 4.

A field test of the contents of the cellophane-wrapped bundles produced a positive result for marijuana.  In all, Agents Aguilar and Flores' search of the Jeep driven by Rodriguez-Reyes yielded 361.92 pounds (164.51 kilograms) of marijuana.

---

[2]*See* Terry v. Ohio, 392 U.S. 1 (1968).

[3]*See* Miranda v. Arizona, 384 U.S. 436 (1966).

**II.  Analysis.**

**A.  U.S. Border Patrol must have "reasonable suspicion" to initiate a *Terry* stop.**

The Fourth Amendment of the United States Constitution proscribes "unreasonable searches and seizures" by the Government.  U.S. CONST. amend. IV.  These protections extend to investigatory *Terry* stops made by U.S. Border Patrol agents on roving patrol.  *United States v. Gandara-Salinas*, 327 F.3d 1127, 1129 (10th Cir. 2003) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975)).

A two-part test is used to assess whether a *Terry* stop violates the Fourth Amendment: (1) the stop must be "'justified at its inception'"; and (2) the agent's conduct in carrying out the stop must be "'reasonably related in scope to the circumstances which justified the interference in the first place.'"  *United States v. Johnson*, 364 F.3d 1184, 1188 (10th Cir. 2004) (quoting *Terry*, 392 U.S. at 20).  Satisfying these requirements necessitates that the Government evidence "'specific and articulable facts which, taken together with rational inferences from those facts,'" gave the agent reason to believe that the "the detainee ha[d] committed or [wa]s about to commit a crime."  *Id.* (quoting *Terry*, 392 U.S. at 21).  Moreover, the Government must show that, in conducting the investigatory detention, the agent's actions were reasonable in scope.  *Id.*  This two-step inquiry is "judged by an objective standard taking the *totality of the circumstances* and information available to the officers into account."  *Id.* (internal citations and quotation marks omitted) (emphasis added).

The following factors are relevant in determining whether an "immigration stop is supported by reasonable suspicion":

> (1) characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent

illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*Gandara-Salinas*, 327 F.3d at 1129-30 (citing *Brignoni-Ponce*, 422 U.S. at 884-85) (additional citations omitted).  An agent may assess these factors in light of his experience and specialized training.  Indeed, a court owes deference to an agent's "ability to distinguish between innocent and suspicious actions" and "may not evaluate and reject each factor in isolation."  *Id.*

**B.  Agent Aguilar had "reasonable suspicion" that Rodriguez-Reyes's vehicle was involved in criminal activity at the time he made the *Terry* stop.**

Rodriguez-Reyes' suppression motion challenges only the validity of the initial *Terry* stop.[4] He argues that Agent Aguilar did not have the requisite "reasonable suspicion" to initiate the stop and, instead, that he acted on "no more than a hunch [that Rodriguez-Reyes] might be involved in illicit activity."  Def.'s Mot. to Suppress at 4.  Rodriguez-Reyes maintains that Aguilar stopped him simply because his Jeep was "the first, and apparently only, vehicle he encountered while responding to the sensor alert."  *Id.* at 5.

Evaluating the facts here, however, it is clear that the *Terry* stop did not violate the Fourth Amendment.  Agent Aguilar clearly had a "reasonable suspicion that the defendant ha[d] committed a crime or [wa]s about to do so."  *Johnson*, 364 F.3d at 1188 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).  That is, he was "aware of *specific articulable facts*, together with rational inferences from those facts," which indicated that Rodriguez-Reyes' vehicle might have been involved in criminal conduct.  *See United States v. Martinez-Cigorroa*, 44 F.3d 908, 910 (10th Cir. 1995) (emphasis

---

[4]Rodriguez-Reyes' motion does not object to the scope of Agent Aguilar's subsequent questioning or vehicle search.  Indeed, it is undisputed that he gave the agent permission to look in the back of the vehicle after telling Aguilar that he did have passengers.  *See* Def.'s Mot. to Suppress at 2.

added).

As noted *supra*, Agent Aguilar was aware of the following, arguably suspicious, given his knowledge of local inhabitants and the vehicles they drove, articulable facts: (1) Rodriguez-Reyes' Jeep, because of its location along NMSR 9, could have caused the sensor alert that triggered shortly beforehand; (2) the Jeep had a significant amount of mud on its fenders and bumper that was indicative, given the recent rain, of a vehicle that had recently traveled along a dirt road; (3) many dirt roads run from the Mexican Border to NMSR 9 west of Columbus, New Mexico; (4) the vehicle was traveling well below the posted speed limit and appeared to be riding low; (5) the Jeep had Arizona license plates; and (6) non-local traffic is highly unusual along that portion of NMSR 9, particularly at that time of night.

These facts are all consistent with Agent Aguilar's belief that Rodriguez-Reyes' vehicle had likely been, or was presently, involved in criminal alien- or drug-smuggling activity. Moreover, because "the ultimate assessment of reasonable suspicion depends on the totality of the circumstances," it is not necessary for these facts to independently give rise to "reasonable suspicion." Instead, they must be viewed together and in context. *See Gandara-Salinas*, 327 F.3d at 1130 ("law enforcement officer may assess these factors in light of his experience and specialized training").[5]

Yet, Rodriguez-Reyes argues, *inter alia*, that Agent Aguilar acted without reasonable suspicion because: (1) when the officer first saw his vehicle he was traveling eastbound, "parallel to rather than away from the border"; (2) he did not try to evade the officer; (3) the Jeep's muddy

---

[5]Indeed, the conclusion that the *Terry* stop here was lawful is bolstered when Agent Aguilar's eight and a half years of experience with the U.S. Border Patrol in the Columbus, New Mexico area is considered. *See id.* Agent Aguilar has been assigned to the Deming, New Mexico Station and, specifically, to patrolling the Columbus area, throughout his tenure with the agency. Prior to the underlying February 24, 2005 incident, the agent had helped apprehend undocumented aliens and seize controlled substances in the Columbus vicinity numerous times.

condition was not suspicious given that it had rained that day and that "practically all roads" in that rural area were dirt, not just those that lead from the border; and (4) the vehicle's out-of-state license plate is irrelevant to the "reasonable suspicion" calculus. *Id.* at 4-5.

First, contrary to Rodriguez-Reyes' position, the fact that Aguilar first encountered Rodriguez-Reyes when he was traveling eastbound, rather than due north away from the border does not undermine Aguilar's claim of "reasonable suspicion." As noted *supra*, NMSR 9 is situated within 1-3 miles of the Mexican border and is frequented by drug and human smugglers. In any case, NMSR 9 intersects with NMSR 11, which does run directly away from the border. Indeed, Aguilar stopped Rodriguez-Reyes after he had turned northbound on NMSR 11.

Second, the fact that Rodriguez-Reyes did not attempt to "evade" the agent does not undermine the validity of the *Terry* stop. The *Brignoni-Ponce* factors clearly consider the "driver's behavior" generally to be relevant to the reasonable suspicion analysis. *See Brignoni-Ponce*, 422 U.S. at 884-85 ("(6) the driver's behavior, including any obvious attempts to evade officers"). It is undisputed that Rodriguez-Reyes' vehicle was traveling well below the speed limit at the time Aguilar initiated the stop. Indeed, while Aguilar was following the vehicle, its rate of speed decreased. Considered in context, this aspect of Rodriguez-Reyes' conduct could reasonably be considered suspicious.

Third, as to the appearance of the vehicle, Rodriguez-Reyes contends that the fact that his Jeep was muddy provided no indicia that criminal activity was afoot given that it had rained in the area and that any vehicles traveling on farm roads in that area would have been similarly mud-covered. Consequently, he argues that Aguilar's assumption that the vehicle had traveled on an undeveloped desert road running from the border was baseless. It is true that a dirty vehicle traveling

along NMSR 9 that day would not have been unusual. But, here, the Jeep was apparently so caked with mud that mud was falling from the vehicle and hitting the Agent's vehicle the entire time Aguilar tracked Rodriguez-Reyes. Hence, Aguilar was reasonable in inferring that the vehicle had likely traveled off-road through the desert very recently.

Fourth, Rodriguez-Reyes contends that the characteristics of the Jeep itself, namely, that it is a SUV and that it had out-of-state plates, provided no indicia of wrong-doing. While he is right that, viewed independently, driving a SUV is not suspicious, the argument fails to recognize that "a court may not evaluate and reject each [*Brignoni-Ponce*] factor in isolation." *Gandara-Salinas*, 327 F.3d at 1130 (citing *United States v. Arvizu*, 534 U.S. 266, 274-75 (2002)). Indeed, the "Supreme Court has expressly rejected this 'divide-and-conquer' analysis." *United States v. Williams*, 403 F.3d 1203, 1207 (10th Cir. 2005) (citing *Arvizu*, 534 U.S. at 274). Not only did Agent Aguilar know that SUVs were popular with traffikers, he observed that this Jeep, a non-local vehicle, was extremely muddy and riding low. Taken together, therefore, it was reasonable for Aguilar to find the appearance of the Jeep suspicious. As to the license plates, Rodriguez-Reyes is correct that, generally, out-of-state plates are "not significantly probative of illegal activity and adds little to the reasonable suspicion equation." *United States v. Marinez-Cigarroa*, 44 F.3d 908, 911 (10th Cir. 1995). Yet, Rodriguez-Reyes failed to note that the Tenth Circuit has also expressly stated: "that out-of-state license plates may be a relevant consideration in some circumstances." *Id.* Here, given Aguilar's familiarity with NMSR 9's traffic patterns, specifically, that the roadway is extremely remote and is rarely used by legitimate, non-local traffic after dark, the Jeep's Arizona license plates

were relevant to the Agent's "reasonable suspicion" calculus.[6]

Taken together, therefore, the facts show that Agent Aguilar had "reasonable suspicion" to believe that criminal activity was afoot when he initiated the *Terry* stop in question.  Accordingly, the *Terry* stop was valid and Rodriguez-Reyes' Motion to Suppress is denied.[7]

**IT IS SO ORDERED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**

---

[6]Furthermore, it is notable that it appears from the parties' motion papers that the triggered sensor, which prompted Agent Aguilar to drive westbound on NMSR 9 on the date in question, is located five miles west of Columbus.  As such, it is approximately two hours and nearly one hundred miles from the Arizona state line.

[7]Rodriguez-Reyes does not challenge the validity of his *Miranda* waiver.  Likewise, there is no indication in the parties' motion papers that his waiver was anything but knowingly and voluntarily given.  As such, there appears no cause to suppress Rodriguez-Reyes' statements to Agent Flores at the scene on Fifth Amendment grounds.